## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**MARY K. PRESLEY,**

      **Plaintiff,**

**vs.**                                                    **Case No.  4:08cv317-SPM/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. LOC. R. 72.2(D).  It is recommended that the decision of the Commissioner be reversed and an order entered that Plaintiff's applications for benefits be granted.

**Procedural status of the case**

Plaintiff, Mary K. Presley, applied for disability insurance benefits and supplemental security income benefits.  Plaintiff was 47 years old at the time of the administrative hearing, has a 12th grade education, and has past relevant work as a

payroll, billing, and personnel clerk.  Plaintiff alleges disability due to lupus, fibromyalgia, and depression.  The Administrative Law Judge found that has the residual functional capacity to do a limited range of sedentary work, can return to her past relevant work, and is not disabled as defined by Social Security law.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

 The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or
equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past
relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the Administrative Hearing[1]**

The administrative hearing was held on March 15, 2006.  R. 576.  Plaintiff

testified that she was last employed in November, 2003.  R. 580.  She worked for the

Leon County School Board as a payroll clerk.  R. 581.  It was a sedentary job.  *Id.*

About every two weeks, she had to lift boxes of checks, and on a daily basis she had to

lift payroll books (computer printouts) weighing 25 to 30 pounds.  R. 582.  The job

required sitting about 6 hours a day.  R. 583.  Plaintiff also described other sedentary

jobs she had done.  R. 584-588.

Plaintiff said she stopped working because she was sick all the time, running a

fever and taking medication.  R. 589.  She said with "all the medication, it's hard to

concentrate, with all the pain medication and the anti-depressants and things."  *Id.*  She

testified that it is hard for her to sit or stand for any length of time, and she lies down

most of the day.  R. 590.  She said she continued to work with pain, and sometimes had

to lie down in her office, but the pain had "gotten a lot worse."  *Id.*  She said that now

she takes four times the amount of pain medication that she did when she was working.

*Id.*

Plaintiff said that with lupus, which was diagnosed in 2000-2001, she had periods

of remission, but her lupus had not recently been in remission.  R. 591.  She also has

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at:  http://www.mercksource.com (Medical Dictionary link).  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.

been diagnosed with fibromyalgia.  *Id.*  She said that lupus makes her tired all of the time, she runs a fever quite often, gets nauseated, and has joint pain.  *Id.*  Her doctors were Dr. Meyer, a primary care physician, and Dr. McMillan, a rheumatologist.  R. 591-592.

Plaintiff said that she has been depressed for many years.  R. 592.  She takes Prozac for depression.  *Id.*  She had started seeing counselors a few years earlier, seeing them once a week.  R. 593.  They are with "EAP," an employee assistance program.  *Id.*  The counselors are not psychiatrists, and Plaintiff explained that she cannot afford to see a psychiatrist.  *Id.*  She also takes medication for anxiety prescribed by Dr. Meyer.  R. 595-596.

When asked to describe her symptoms from lupus and fibromyalgia, Plaintiff said that she hurts all the time, that her joints hurt and she has "a lot of swelling" a couple of times a week.  R. 597.  She said that the pain was "real excruciating" and never completely goes away.  R. 597-598.  She takes Percocet[2] four times a day, muscle relaxers three times a day, and Advil four times a day.  R. 598.  She also takes Robaxin.[3]  *Id.*  These help, but do not get rid of all of the pain.  *Id.*  When asked about side effects from her medications, Plaintiff mentioned weight gain and itching.  R. 601.

---

[2] Percocet, a narcotic analgesic, is used to treat moderate to moderately severe pain.  It contains two drugs – acetaminophen and oxycodone.  Acetaminophen is used to reduce both pain and fever.  Oxycodone, a narcotic analgesic, is used for its calming effect and for pain.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[3] Robaxin is prescribed, along with rest, physical therapy, and other measures, for the relief of pain due to severe muscular injuries, sprains, and strains.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

Plaintiff testified that she could sit for only about 20 minutes before needing to change positions.  R. 601.  She said that it is "real hard for me to get up after I've been sitting for long periods," and she was told by Dr. Zeb to limit her sitting and standing to no more than 10 minutes.  R. 602.  She thought she could "be on her feet" for about an hour.  *Id.*  She then said she thought she could sit for about 30 minutes without changing positions.  *Id.*  She acknowledged that her physicians have recommended that she exercise and try to lose weight.  R. 603.  She thought that she could lift about 10 pounds.  *Id.*  She said that she can use her hands to grasp and manipulate, can bend over, but not well, can climb a short flight of stairs, and can do some reaching above her shoulder.  R. 604.

Plaintiff said that her husband does most of the grocery shopping.  R. 602.  She can go into the store for about 15 minutes to pick some things up.  *Id.*  Her husband does a "big portion of the cooking," and she and her husband eat out a lot.  R. 604.  She said that she picks up things around the house, but her husband does most of the vacuuming and mopping.  R. 605.  She does some laundry.  *Id.*  When asked why her daily activities are more limited that she had earlier report to the state social security agent, Plaintiff explained that she filled those reports of daily activities out a "couple of years ago," and she had not been able to "do a lot lately."  R. 606.  Plaintiff said she reads, watches television, and visits sometimes.  *Id.*  She said she had not pulled weeds in over a year.  R. 607.  She said that in an 8 hour day, she spends 6 hours lying down.  R. 610.

Plaintiff said that she smokes a pack of cigarettes a day.  R. 608.  All of her doctors had told her to quit.  *Id.*  She had tried to quit, without success.  *Id.*

The vocational expert testified that the payroll clerk job identified by Plaintiff as her past relevant work is a semi-skilled sedentary job with an SVP[4] of four.  R. 612.  As performed by Plaintiff, lifting up to 50 pounds only 10% of the time, it was a medium exertional level job.  *Id.*  The bill clerk and personnel clerk jobs identified by Plaintiff as past relevant work were also semi-skilled sedentary job with an SVP of four.  R. 612-613.  Assuming that Plaintiff was capable of sitting 6 hours, standing 2 to 4 hours, lifting 10 pounds occasionally, and must avoid climbing, heights, dangerous machinery, extreme temperature changes, fumes, odors, and gas, the vocational expert said that Plaintiff could do her past relevant work as perform 90% of the time,[5] as a sedentary job.  R. 613-614.

**Medical Evidence**

Plaintiff was treated by Shahid Zeb, M.D., board certified in internal medicine and rheumatology, on April 26, 2002.  R. 291.  A second blood test was positive for Systemic Lupus Erythematosus.  *Id.*  Dr. Zeb said that Plaintiff had had lots of fatigue for the past several months, and had generalized achiness all over her body.  *Id.*  He

---

[4] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  *See* SSR 00-4p, available at 2000 WL 1898704.

[5] It was also noted that Plaintiff was not required to lift anything over 10 pounds in her last job.  R. 614.

started her on Plaquenil.[6]  *Id.*  Her treating primary physician, Stephen Meyer, M.D.,

thought that lupus was either "probable" or "possible."  R. 284, 283.

On October 21, 2002, Plaintiff was seen by Scott T. Persellin, M.D., a

rheumatologist at the Mayo Clinic in Jacksonville, Florida.  R. 171.  Plaintiff said that she

was uncertain whether taking Plaquenil had been helpful.  *Id.*  Dr. Persellin noted that

she had had chronic depression and was "on a high-dose of Prozac."  *Id.*  He noted that

her depression was "under local care."  R. 169.  He noted that she had had a positive

antinuclear antibody reading, but that she did not have the characteristic symptoms or

physical findings of lupus.  *Id.*  He thought that she had "mild fibromyalgia."  *Id.*  He

recommended a "progress fitness and conditioning program" such as a recumbent bike

or swim program.  *Id.*  On November 1, 2002, Dr. Persellin commented that the positive

antinuclear antibody reading "does not appear to be associated with a connective tissue

or other autoimmune disease."  R. 167.

Plaintiff returned to Dr. Zeb on November 20, 2002, feeling better.  R. 281.  Dr.

Zeb said that the only way to know if Plaintiff had lupus was to stop taking Plaquenil and

if she got worse, "that will mean that she has lupus."  *Id.*  His diagnosis was fibromyalgia

and possible SLE.  *Id.*  He ordered that she discontinue Plaquenil.  *Id.*

On December 4, 2002, Plaintiff was seen by Stephen Meyer, M.D., her treating

physician for primary care.  R. 279.  She said that she had stopped taking Plaquenil,

---

[6] Plaquenil is prescribed for the prevention and treatment of certain forms of malaria. Plaquenil is also used to treat the symptoms of rheumatoid arthritis such as swelling, inflammation, stiffness, and joint pain.  It is also prescribed for lupus erythematosus, a chronic inflammation of the connective tissue.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

"stopped her anti-inflammatories and within a week she said she was just miserable."
R. 279.  She started back on all of her medicines and was "feeling better."  *Id.*  Dr.
Meyer said that "even if she did not have true lupus that it was a lupus-like illness that
was responding to the Plaquenil."  *Id.*

    Plaintiff was seen by Craig A. Butler, M.D., on July 28, 2003, with right knee pain.
R. 267.  She complained of multiple arthralgias.  *Id.*  He found that her knee pain was
"consistent with a lupus type inflammatory reaction."  *Id.*

    On November 21, 2003, Plaintiff was admitted to Tallahassee Memorial
Behavioral Health Center having taken too much medicine (Ativan[7]) to try to sleep.  R.
189, 190.  She was upset because she had recently left her job and had applied for
disability.  *Id.*  On discharge, she was calm, cooperative, pleasant, and "her mood and
affect were quite a bit brighter than at the time of admission."  R. 189.  On Axis V, her
GAF (global assessment of functioning) score[8] was in the 30's[9] at admission and 60's to

---

    [7] Ativan is used in the treatment of anxiety disorders and for short-term (up to 4
months) relief of the symptoms of anxiety.  It belongs to a class of drugs known as
benzodiazepines.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

    [8] Axis V of the DSM-IV Multiaxial System and the meaning of the GAF scores is
explained at:  http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.  "The GAF scale
reports a 'clinician's assessment of the individual's overall level of functioning.'
*American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders*
30 (4th ed. 1994)."  Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).

    [9] A GAF score of 31-40 indicates: "Some impairment in reality testing or
communication (e.g., speech is at times illogical, obscure, or irrelevant ) OR major
impairment in several areas, such as work or school, family relations, judgment,
thinking, or mood ( e.g., depressed man avoids friends, neglects family, and is unable to
work; child frequently beats up younger children, is defiant at home, and is failing at
school )."  *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

70's[10] on discharge.  R. 190.  She was discharged with a diagnosis of dysthymia and

adjustment disorder with depressed mood.  *Id.*  It was also noted that she had chronic

pain syndrome secondary to lupus and fibromyalgia.  *Id.*

On November 12, 2003, Plaintiff again saw Dr. Meyer.  R. 257.  Plaintiff reported

that she was having a hard time and felt fatigued all of the time.  *Id.*  She said that she

"constantly feels like she has the flu, weak, tired, has chest pain, leg pain, [and] back

pain." *Id.*  Her depression "seems to be worsening rather than getting better."  *Id.*  Dr.

Meyer found "a lot of joint tenderness" with "trigger point tenderness and muscle

tenderness." *Id.*  His diagnosis was lupus, fibromyalgia, and depression.  *Id.*  Plaintiff

asked Dr. Meyer to complete disability rating forms, but he said he could not complete

the forms because he did not have the dictionary of occupational titles.  *Id.*  He referred

Plaintiff to "Dr. Butler who has seen her on multiple occasions or Dr. Zeb who has seen

her for her fibromyalgia and lumpus."  *Id.*

On November 17, 2003, Dr. Meyer entered a handwritten note recommending

that Plaintiff go to Shands Hospital (in Gainesville, Florida) or Mayo clinic (in

Jacksonville, Florida) for second opinions as to fibromyalgia and lupus.  R. 257.  On

November 19, 2003, Craig A. Butler, M.D., an orthopedic specialist, saw Plaintiff and

---

[10] A GAF score of 51-60 indicates: "Moderate symptoms ( e.g., flat affect and circumstantial speech, occasional panic attacks ) OR moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or co-workers).  A GAF score of 61-70 indicates: "Some mild symptoms ( e.g., depressed mood and mild insomnia ) OR some difficulty in social occupational, or school functioning ( e.g., occasional truancy or theft within the household ), but generally functioning pretty well, has some meaningful interpersonal relationships."  *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

she asked him to fill out her disability paperwork.  R. 242.  Dr. Butler said that "[w]hile her diagnosis is systemic lupus, her fibromyalgia may qualify her for permanent partial disability, it does not rise to the level of total disability."  *Id.*  Dr. Butler further said: "I took the time to call and talk to Dr. Stephen Meyer and he is in agreement that she does have significant symptoms relative to her connective tissue disorder, but does not meet the threshold for total disability."  *Id.*  Dr. Butler also said: "I do not . . . do disability determinations here in the office and I am not sure those are offered through CHP [Capital Health Plan, a local HMO]."  *Id.*  Dr. Butler felt that Plaintiff should be examined at either Shands or Mayo to gain a better understanding of her disease.  *Id.*  He did not think her chronic pain level warranted an injection of anesthetic.  *Id.*

Plaintiff next was examined on December 30, 2003, on a consultative basis by Kirk J. Mauro, M.D.  R. 197.  He noted that she had been "seen by Dr. Zeb and diagnosed with diffuse fibromyalgia and chronic pain.  She has associated depression because of her pain."  *Id.*  He said: "The patient is requiring daily narcotics of Darvocet[11] and Percocet, in addition to Ativan and Soma.[12]  The combination of these medications makes her quite sedated.  She tells me that she occasionally loses her balance.  Because of depression she has been on Prozac."  *Id.*  He thought that she could walk "short distances" and "can only sit for 30 minutes because of severe stiffness and then she must get up and walk."  *Id.*  During the examination, he noted that

---

[11] Darvocet-N 50 or 100 contains propoxyphene hydrochloride, a mild narcotic analgesic related to methadone.  PHYSICIANS' DESK REFERENCE (2004), pp. 403-404.

[12] Soma is used, along with rest, physical therapy, and other measures, for the relief of acute, painful muscle strains and spasms.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

Plaintiff's "eyes are held in a somewhat ptosis[13] position, possibly due to her narcotics

and medications."  R. 198.  Plaintiff frequently rubbed her neck and shoulders due to

pain.  R. 198.  He found limited flexion and extension, but her shoulders, elbows, wrists,

fingers, hips, knees, and ankles had "functional range of motion."  *Id*.  She was unable

to squat, and her lumbar flexion and extension was significantly restricted.  *Id*.  Dr.

Mauro concluded:

> The patient is here for a disability evaluation.  At this time, the patient is
> severely restricted.  She has significant diffuse chronic pain, consistent
> with fibromyalgia.  She has associated depression and lupus with multiple
> orthopedic surgical interventions.  The patient requires a buildup in her
> right shoe, due to the leg length discrepancy to accommodate the gait
> pattern, but all of this has resulted in her requiring chronic medications
> and narcotics.  She is at very high risk for falls and self-injury.  I believe it
> is very unlikely this patient is capable of being competitive, even in a
> sedentary level of employment, because of her diffuse pain and chronic
> narcotic usage.  I believe this patient is permanently and totally disabled,
> secondary to her multiple underlying comorbidities, chronic pain, lupus,
> fibromyalgia and associated depression.  I strongly recommend she be
> seen by a psychiatrist, if this has not been made available.

R. 199.  Dr. Mauro confirmed his disability opinion by filling out a "Florida Retirement

System Physician's Report."  R. 411.  He determined that she had severe limitation of

functional capacity, and was permanently incapable of any kind of work.  *Id*.  He also

said she was incapable of sedentary activity.  R. 414.

On December 31, 2003, Dr. Meyer again saw Plaintiff for treatment.  R. 250.

Plaintiff had been trying to get by without any pain medication, but was having "a lot

more pain than usual."  *Id*.  He referred her to Dr. McMillan, a rheumatologist.  *Id*.

---

[13] Ptosis is also called "drooping eyelid."  It is caused by weakness of the muscle
responsible for raising the eyelid, damage to the nerves that control those muscles, or
looseness of the skin of the upper eyelids.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH
CONSUMERS.

On January 6, 2004, Dr. Meyer completed the "Florida Retirement System Physician's Report." R. 414. He said that Plaintiff was severely limited in her functional capacity, unable to do any kind of work, and could not do sedentary work. R. 416, 414.

On April 12, 2004, Plaintiff was examined on a consultative basis by May Tay, Ph.D., for a mental health evaluation. R. 208. Plaintiff drove herself to the examination. *Id.* Dr. Tay noted that Plaintiff had a "sustained employment history; she worked as a secretary, billing clerk, and human resource/payroll assistant for over 27 years prior to November 13, 2003." *Id.* She said that her treating physician, Dr. Meyer, had advised her to apply for disability benefits. R. 209. Plaintiff had had two inpatient admissions for mental health reasons. *Id.* The first occurred at age 17 when she saw her father shoot her mother five times in front of her. *Id.* The second (noted above) was when she overdosed on Ativan. *Id.* She said she was taking Ativan and Prozac prescribed by Dr. Meyer. *Id.* Plaintiff complained of severe pain and looked tired. *Id.* Her mood was "somewhat depressed." *Id.* She felt her mood was a little better as she had accepted "the pain" and found benefits from use of a hot tub. *Id.* On testing, Dr. Tay found that Plaintiff did not have any significant cognitive or memory impairment. *Id.* She thought that her current inability to work was 99% due to physical conditions and 1% due to depression. *Id.* She told Dr. Tay that she could "drive, manage money, do word processing, read emails and do internet searches, cook supper, shop for groceries, and do laundry when physically able." *Id.* She said she picks up her grandchildren and spends about an hour every weekday with them. *Id.* Dr. Tay determined that Plaintiff did "not present with a mental illness that would preclude her from working." R. 210. She thought that Plaintiff had "sufficient cognitive and adaptive skills to perform simple

tasks and work-like procedures," with some limitations of consistency and pace.  *Id*. "Functional restrictions appear largely secondary to physical complaints."  *Id*.

On May 27, 2004, Victor M. McMillan, M.D., a rheumatologist, examined Plaintiff on referral from Dr. Meyer.  R. 229.  She said that she had tried to stop her medications, primarily due to expense, but she had more difficulty and was again taking her medication.  R. 230.  She was trying to exercise by walking.  *Id*.  He said that Plaintiff was taking Percocet up to three tablets per day, but none some days.  R. 229.  She was then taking 18 medications.  R. 230-231.  She smoked one pack of cigarettes per day. R. 231.  She had had a forty to fifty pound weight gain over the prior two years.  *Id*.  On examination, Dr. McMillan found Plaintiff's range of motion of her shoulders, hips, and cervical spine to be "functional."  R. 232.  Her motor strength was 5/5.  *Id*.  There was no focal tenderness over the spine, but there was some tenderness at the elbows.  *Id*. Dr. McMillan found tenderness in 14 of the 18 locations tested.  *Id*.  Dr. McMillan agreed with the prior diagnosis of fibromyalgia.  *Id*.  He thought that she might also have another illness that mimicked fibromyalgia.  R. 233.  He thought that she could not be classified "cleanly into one systemic autoimmune syndrome or another at this point."  R. 233.  He said she had possible undifferentiated connective tissue disorder.  *Id*.  He said that she had a history of chronic diffuse articular and nonarticular musculoskeletal pain, fatigue, sleep disturbance, feverish symptoms, accelerated pain, headaches, and chest pains.  *Id*.  He recommended avoidance of corticosteroid use as

much as possible.  *Id*.  He recommended heat and rest for flares of symptoms, and aerobic, stretching, and light resistance exercise.  *Id*.

On June 7, 2004, Plaintiff was again seen by Dr. Meyer.  R. 241.  She said that she was fatigued overall and the "aching is just really coming back strong."  *Id.*  Dr. Meyer's diagnosis was fatigue, connective tissue disease, possible lupus.  *Id.*

On August 6, 2004, Plaintiff returned to Dr. Meyer.  R. 468.  She had felt over-medicated and had stopped most of her medications.  *Id.*  She said she was feeling better since she had stopped her medications, but her arthritis was really flaring up.  *Id.*  She wanted referral to "pain management" and was seeing a counselor, which was helping.  *Id.*  Dr. Meyer found "positive trigger point and tenderness throughout her back and neck."  *Id.*  His diagnosis was fibromyalgia and lupus or both.  *Id.*  He thought it would be a good idea to stop taking all medications except Plaquenil, and minimal Soma and Percocet.  *Id.*  He wanted her to continue to walk, but in air conditioning and on flat surfaces.  *Id.*

On August 24, 2004, Plaintiff returned to Dr. McMillan.  R. 240.  She was "alert, no acute distress," and reported no new symptoms.  *Id.*  She was having right shoulder pain, in spite of using heat at home.  *Id.*  She had been trying to exercise her shoulder. *Id.*  She had returned to using her medications "after having more difficulty."  *Id.*  She was trying to exercise by walking.  *Id.*  Dr. McMillan's diagnosis was "FMS," fibromyalgia syndrome.  *Id.*

Plaintiff was seen again by Dr. Meyer on December 7, 2004, complaining of joint pain.  R. 465.  She said that "periods of stress make her condition worse."  *Id.*

Dr. Meyer's next medical note is date March 29, 2005.  R. 464.  She said she had been having "a lot more pain lately."  *Id.*  She had gained weight and was "just depressed."  *Id.*  Dr. Meyer said:

> She has tried bicycle riding, tried some exercises, but anything she does
> seems to hurt.  She said she really cannot do the things she used to enjoy
> and what used to bring her pleasure now brings pain instead.

*Id*.  Dr. Meyer noted "multiple trigger points."  *Id*.  His diagnosis was fibromyalgia, lupus,

and depression.  *Id*.  He wanted Plaintiff to begin "something like yoga, tai chi,

something that is slow [and] more flexible."  *Id*.

On July 19, 2005, Plaintiff told Dr. Meyer that the Percocet was "not covering her

pain as well as it did previously."  R. 462.  She wanted a stronger dose.  *Id*.  Dr. Meyer

did not want to do that, and said that there was only one dose higher, and "that would

be the highest we could go to."  *Id*.  He did prescribe the higher dose, however.  *Id*.

On September 21, 2005, Plaintiff again saw Dr. Meyer.  R. 458.  She told him

that "things have really been going well for her lately.  Has not had any major issues

since the disability all worked out."[14]  *Id*.  He noted: "She is otherwise doing well.  Said

her pain is well managed under the current regimen and the anxiety is much better

overall."  *Id*.  He continued the diagnosis of fibromyalgia.  *Id*.

On January 19, 2005, Plaintiff's hands and wrists were x-rayed.  R. 544.  Dr.

McMillan noted mild to moderate osteoarthritis in her hands and wrists.  *Id*.

Plaintiff attended the Employee Assistance Program (EAP) from August 4, 2004,

through January 20, 2005, for counseling for depression.  R. 471-472.  Mary Wilkes, a

licensed clinical social worker, provided a detailed summary of her course of treatment

there for this period.  Ms. Wilkes said that it was not their practice "to release full client

contact notes," and instead provided a "comprehensive summary of my work with Ms.

---

[14] This was Florida retirement medical disability income.  R. 571.

Presley."  R. 471.  She said that Plaintiff "presented with chronic, severe depressive symptoms."  *Id.*  Ms. Wilkes said that Plaintiff "suffers from chronic major depression as evidenced by" "depressed mood most of the day, nearly every day," "markedly diminished interest/pleasure in almost all activities," "significant weight gain (more than 40 pounds)," "insomnia every day or nearly every day," "psychomotor retardation evidence to an observer," "fatigue or loss of energy every day," "feelings of worthlessness or excessive guilty nearly every day," "diminished ability to think or concentrate, or indecisiveness, nearly every day," and "recurrent suicidal ideation."  R. 471-472.  Ms. Wilkes said:

> Her symptoms had been severe and ongoing for at least two years, even on a large dose of antidepressant medication (60 mg/day of Prozac).  Her ability to carry out minimal activities of daily living (preparing meals, going grocery shopping, and light housekeeping) is significantly impaired.  I estimate that during the last two years her level of functioning has varied between 30 and 40 on the Global Assessment of Functioning Scale.  This level of impairment includes inability to work, impaired judgment and thinking, depressed mood with strong emotional reactivity.  As an example, when she has tried to increase her level of physical activities (begin a very gentle walking routine, or increase her activities around the house), she has experienced a flare-up of symptoms that has confined her to bed for several days.  I do not believe Ms. Presley is malingering: I believe she is making sincere efforts to deal with a chronic, debilitating disorder.

R. 472.

Plaintiff also attended 14 sessions at the Employee Assistance Program from October 4, 2005, through February 6, 2006.  R. 475-476.  She was treated by Cheryl Rainey, an MFT doctoral intern for "Severe Major Depressive Disorder, Chronic and Dysthymic Disorder."  R. 475.  Ms. Rainey said that Plaintiff continually met the criteria for a diagnosis of a mental disorder, by "inability to focus in therapeutic sessions, often

repeating herself, and demonstrating the inability to make simple decisions," "signs of

clinical depression," "physical pain and discomfort from sitting upright for short periods,

at times unable to walk up stairs to my office," "distress and signs of overwhelm when

asked to complete simple tasks," "difficulty in completing simple therapeutic homework

tasks in a timely manner," "observable weight gain," "reported nightly bouts with

insomnia," "symptoms of hopelessness," "severe self-criticism and seeing self as

incapable," "recurrent suicidal ideations," "inability to complete simple daily tasks, such

as preparing food, personal hygiene, dressing her self appropriately," "emotional

reactivity," and "obvious psychomotor retardation." R. 475-476. Ms. Rainey concluded:

> In my opinion, Ms. Presley is not a malingerer. She reportedly suffers
> from Lupus, Arthritis, and Fibromyalgia and is severely affected, mentally
> and physically, by the medications necessary to treat these diseases. Ms.
> Presley's impairment ranges from marked to extreme at all levels. If she
> were placed under any stress, particularly daily stress experienced in
> simple employment situations, her physical and mental state would
> worsen.

R. 476. Ms. Rainey filled out a "Questionnaire as to Mental Residual Functional

Capacity." R. 477. She said that Plaintiff had extreme or marked limitations in all

phases of social interaction, ability to sustain concentration and persistence, and

adaption. 477-479.

On March 2, 2006, Dr. Meyer completed a "physical capacity evaluation." R.

562-563. He said that he thought that Plaintiff could sit for only 1 hour per workday, and

could stand or walk for only 1 hour. R. 562. He said that Plaintiff could not use her

hands to repetitively push, pull, or do fine manipulation. *Id.* He thought that Plaintiff

could not do sedentary work for 8 hours a day, 5 days a week. R. 564. He said that the

cause of this disability was "Lupus/Fibromyalgia." *Id.* He said that Plaintiff had such

pain as to "be intractably and virtually incapacitating to this individual" and that bed rest and pain medication was needed.  R. 565.  Dr. Meyer said that side effects of Plaintiff's medications "can be expected to be severe and to limit effectiveness due to distraction, in-attention, drowsiness, etc."  R. 566.  He said that Plaintiff had an underlying physical condition consistent with the pain that Plaintiff experiences.  *Id*.

On December 1, 2006, Plaintiff was seen on a consultative basis for an "outpatient psychiatric evaluation" by P. D. Zislis, M.D.  R. 571-573.  The purpose was to reassess her antidepressant medications.  R. 571.  Plaintiff said that she was scheduled to be evaluated by a pain management specialist, Dr. Arcos, and switching from Percocet to Oxycontin or Methadone was under consideration.  R. 572.  Dr. Zislis's diagnosis was "dysthymic/depression NOS and chronic anxiety NOS (by patient's report secondary to chronic pain difficulties)."  *Id*.  He recommended a trial change from Prozac to Cymbalta.  R. 573.  He also recommended Subutex rather than Percocet, Oxycontin, or Methadone, and recommended referral to Dr. Tim Walker, a pain management physician.  *Id*.  She was encouraged to "look into water aerobics therapy." *Id*.

**Legal Analysis**

**Whether the ALJ erred at step 2 by finding that did not have a "severe" impairment of depression**

The Administrative Law Judge determined at step 2 that Plaintiff does not have a "severe" impairment of depression.  R. 17.  Plaintiff contends that this was error.

At step 2, the issue is whether Plaintiff has shown that she has a condition which has more than "a minimal effect on her ability to:  walk, stand, sit, lift, push, pull, reach, carry, or handle, etc."  Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521).  "In other words, the 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality."  McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

"[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' "  Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986), *citing* Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984), Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984), and Flynn, 768 F.2d at 1274.  "Step two is a threshold inquiry.  It allows only claims based on the most trivial impairments to be rejected.  The claimant's burden at step two is mild."  McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying Brady).  A "severe impairment" is a "de minimis requirement which only screens out those applicants whose medical problems could 'not possibly' prevent them from working."  Stratton v. Bowen, 827 F.2d 1447, 1452 n. 9 (11th Cir. 1987), *quoting*

Baeder v. Heckler, 768 F.2d 547, 551 (3d Cir. 1985).  It also has been characterized by

the Supreme Court as a criterion which identifies "at an early stage those claimants

whose medical impairments are so *slight* that it is unlikely they would be found to be

disabled even if their age, education and experience were taken into consideration."

Stratton, 827 F.2d at 1452 n. 9 (emphasis by the court), *quoting* Bowen v. Yuckert, 482

U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987).

> The Administrative Law Judge determined at the outset:
>
> In reaching this conclusion [that Plaintiff's depression was not a "severe"
> impairment], I begin with an understanding that the accepted diagnosis of
> fibromyalgia discussed above requires in part that there is no other
> identifiable medical problem that could account for the subjective
> complaints of fatigue, joint pain and general malaise that accompany the
> condition.  If in fact the claimant had a formal diagnosis of a major
> depressive disorder, such would mitigate against the diagnosis of
> fibromyalgia as some of the symptoms that are assessed as caused by
> fibromyalgia may not be attributed to fibromyalgia but rather depression.

R. 17.  In other words, the ALJ reasoned that if Plaintiff is depressed, she cannot have

fibromyalgia, and if she has fibromyalgia, she cannot be depressed.  Neither I nor the

Administrative Law Judge are competent to draw that sort of a medical conclusion

without support from opinions of physicians, and there are no such opinions in this

record.  As a consequence, the reasoning lacks support of substantial medical evidence

in the record.

Indeed, the medical record is entirely to the contrary.  On December 30, 2003,

Dr. Mauro found that Plaintiff had "associated depression *because of her pain*."  R. 197

(emphasis added).  Dr. Mauro also said: "Because of depression she has been on

Prozac."  *Id.*  He concluded: "I believe this patient is permanently and totally disabled,

*secondary to* her multiple underlying *comorbidities*, chronic pain, lupus, fibromyalgia and

*associated* depression." R. 199 (emphasis added). Dr. Meyer entered a diagnosis of depression on multiple occasions, in addition a diagnosis of lupus and fibromyalgia.[15] *E.g.*, on November 12, 2003, and March 29, 2005. R. 257, 464.

Moreover, the undisputed evidence in the record shows that the medications that Plaintiff must take to cope with the pain and fatigue of her auto-immune disease, whether lupus or fibromyalgia or both, has a significant debilitating effect upon her mental health. Dr. Mauro said that the combination of her narcotic medications (Darvocet, Percocet, Ativan, and Soma) make her "quite sedated." R. 197. Dr. Meyer said that side effects of Plaintiff's medications "can be expected to be severe and to limit effectiveness due to distraction, in-attention, drowsiness, etc." R. 566. The treating licensed clinical social worker, Ms. Rainey, said that Plaintiff "is severely affected, *mentally* and physically, by the medications necessary to treat these diseases [Lupus, Arthritis, and Fibromyalgia]." R. 476 (emphasis added).

The ALJ also determined in part at step 2 that Plaintiff's depression was not a severe impairment because she had had only one hospital stay for mental health reasons, and was discharged on that one occasion with a relatively high GAF score.[16] R. 17-18. If this were the only evidence on the subject of Plaintiff's experience of depression, the reasoning might be supported by substantial evidence in the record. A

---

[15] According to the Mayo Clinic website (www.mayoclinic.com/health), depression is a symptom of lupus, along with fatigue, fever, weight loss or gain, and joint pain, stiffness and swelling. Likewise, that website reports that many people who have fibromyalgia have depression and Lupus.

[16] She came in on that same occasion with a GAF score in the 30's, showing substantial impairment at that time.

single hospital episode like this is not enough evidence of more than a slight impairment from depression. But it is not the only evidence, and the ALJ is required to consider all of the evidence in the record. "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

In the course of determining that Plaintiff's depression is not a "severe" impairment at step 2, the ALJ considered the evidence from the two treating licensed clinical social workers. The ALJ said that he gave *no* evidentiary weight to the "statements" of the two clinical social workers. R. 18.

Social Security Rule 06-03p provides that licensed clinical social workers are considered to be "medical sources" of information and also as "other sources," but not clinical social workers are not "acceptable medical sources." The Ruling provides that the Commissioner "may use evidence from 'other sources' . . . to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." The Ruling also cautions:

> Information from these "other sources" cannot establish the existence of a
> medically determinable impairment.  Instead, there must be evidence from
> an "acceptable medical source" for this purpose.  However, information
> from such "other sources" may be based on special knowledge of the
> individual and may provide insight into the severity of the impairment(s)
> and how it affects the individual's ability to function.

The Ruling further points out that "[w]ith the growth of managed health care in recent

years and the emphasis on containing medical costs," medical sources, such as

licensed clinical social workers and others (nurse practitioners, physician's assistants)

"have increasingly assumed a greater percentage of the *treatment and evaluation*

*functions* previously handled primarily by physicians and psychologists."  (Emphasis

added.)  Therefore, "[o]pinions from these medical sources, who are not technically

deemed 'acceptable medical sources' under our rules, are important and should be

evaluated on key issues such as impairment severity and functional effects, along with

the other relevant evidence in the file."  The Ruling provides that among the factors to

consider when evaluating the opinions of "other sources" are the length of time and

frequency of treatment, consistency with other evidence, the degree to which the source

presents relevant evidence to support the opinion, how well the opinion is explained,

and whether the source has a special expertise.  The Ruling states that it may be

appropriate to give more weight to the opinion of an "other source" medical source than

to an "acceptable medical source" if the medical source has seen the claimant more

often and has provided better supporting evidence.  SSR 06-03p.

     The ALJ said that in part he gave no weight to the opinions of clinical social

workers Rainey and Wilkes because he found that they did not " 'treat' the claimant on a

regular basis but rather saw her sporadically."  R. 18.  This conclusion is not supported

by substantial evidence in the record, and is not an adequate reason to completely

disregard the opinions of clinical social workers Wilkes and Rainey.  Ms. Wilkes did not

state how many times she saw Plaintiff for depression, but she was her therapist from

August 4, 2004, through January 20, 2005, a long enough treating period to develop a

sound opinion about her mental health.  R. 471-472.  Clinical social worker Rainey was

very specific.  She said that Plaintiff attended 14 sessions at the Employee Assistance

Program from October 4, 2005, through February 6, 2006.  R. 475-476.   Dr. Tay saw

Plaintiff only once.

      The ALJ also said that he completely discounted the clinical social worker

evidence in part because they did not provide any records to support their opinions.  R.

18.  They did not provide records because it is not their practice to provide such records

from the employee assistance program due to privacy concerns.  The privacy concerns

of patients are routinely set aside in social security cases.  This record contains

hundreds of pages of Plaintiff's private medical records.  If the ALJ had misgivings about

the opinions of clinical social workers Wilkes and Rainey for lack of mental health

treatment records, he easily could have acquired the records with privacy waivers from

Plaintiff.[17]  Of course, an ALJ need not acquire additional evidence if the record contains

_____

      [17] Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's
duty to investigate the facts and develop the arguments both for and against granting
benefits . . . ."  Sims v. Apfel,  530 U.S. 103, 110-111, 120 S.Ct. 2080, 2085, 147
L.Ed.2d 80 (2000), citing Richardson v. Perales, 402 U.S. 389, 400-401, 91 S.Ct. 1420,
28 L.Ed.2d 842 (1971).  "Because a hearing before an ALJ is not an adversary
proceeding, the ALJ has a *basic* obligation to develop a full and fair record."  Graham v.
Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997) (emphasis added), *citing*, Cowart v.
Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).  This basic duty exists whether or not
the claimant is represented.  Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995)
(citation omitted).

sufficient evidence to make a decision,[18] and that is the case here.  The written

statements of the two clinical social workers are unusually complete.  They said that

they intended not only to provide opinions, but to provide a full summary of what was

contained in the treatment records.  Unlike the usual treating physician opinion, these

contain full summaries of findings made during the treatment process.

Consequently, the reason given by the ALJ for giving no weight at all to the

*findings* and opinions licensed clinical social workers Wilkes and Rainey does not

comply with Social Security Ruling 06-03p and is not supported by substantial evidence

in the record.  The opinions of clinical social workers Wilkes and Rainey should have

been fully considered and given significant weight.

Another reason given by the ALJ for finding that Plaintiff's depression was not a

"severe" impairment came from his own observations of Plaintiff during the hearing.  He

said:

> During the hearing, I observed the claimant was articulate and had no
> observable difficulty in comprehending questions or providing answers.
> She appeared to pay attention throughout the procedure and otherwise
> displayed no attention or concentration deficits.

R. 19.  While credibility determinations are well-within the authority of an administrative

law judge during a hearing, a medical judgment as to whether Plaintiff suffers from

depression as she sits there is not.  Of course, a lay person is competent to judge

whether a person is responsive, maintains focus, and apparently comprehends during a

hearing, but the medical evidentiary value of these short observations, by a person

without medical training, is slight.  In the Eleventh Circuit, it is not appropriate for the

---

[18] <u>Wilson v. Apfel</u>, 179 F.3d 1276, 1278 (11th Cir. 1999).

Administrative Law Judge, who is not a medical expert, subjectively to arrive at an index of traits which he expects the claimant to manifest at the hearing, and then to deny the claim when such traits are not observed.  Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir. 1982).[19]  This was not an adequate basis from which the ALJ could properly determine whether Plaintiff's depression was a "severe" impairment at step 2.

The final support for the ALJ's determination that Plaintiff's depression is not a "severe" impairment was the consultative examination by Dr. Tay.  Dr. Tay is a licensed psychologist, and her opinions are afforded more weight as an "accepted medical source."  SSR 06-03p.  A one-time consultative examination, however, need not be given deference by the Commissioner.  McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987).  Thus, while a residual functional capacity assessment by a consulting physician can be substantial evidence to support a hypothetical to a vocational expert, Johansen v. Barnhart, 314 F.3d 283, 288 (7th Cir. 2002), there is contrary authority. Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998) ("opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.").

---

[19]  The Eleventh Circuit has termed this "sit and squirm jurisprudence," and forbids that this method of analysis be used.  McRoberts v. Bowen, 841 F.2d 1077, 1081 (11th Cir. 1988); Johns v. Bowen, 821 F.2d 551, 557 (11th Cir. 1987); Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984).  It is proper, however, for the ALJ to consider the claimant's demeanor and appearance during the hearing as long as this is not in lieu of consideration of the medical evidence presented.  Norris v. Heckler, 760 F.2d 1154, 1158 (11th Cir. 1985); Macia v. Bowen, 829 F.2d 1009, 1011 (11th Cir. 1987).  "We do not accept an ALJ's mere reliance on his observation of a claimant during a hearing as the only basis upon which to reject a claimant's reference to pain."  Norris, 760 F.2d at 1158.

From Dr. Tay's report, the ALJ noted that Plaintiff had stopped work in November, 2003, primarily due to physical problems, and she told Dr. Tay that her physical problems were 99% of her problems.  R. 18-19.  The ALJ also pointed out that Dr. Tay found that Plaintiff was alert, cooperative, and could smile and converse without difficulty.  R. 19.  He noted that Dr. Tay found that she showed no oddities of thought, was fully oriented, and had no delusional thinking.  *Id.*  He also noted that Plaintiff told Dr. Tay that she could drive, manage money, do word processing, do email and internet searches, cook supper, shop, and do laundry when physically able.  *Id.*  All of these comments are supported by substantial evidence in the record.  Plaintiff, however, was seen once by Dr. Tay, on April 12, 2004.  Dr. Tay did see Plaintiff thereafter, and she did not treat or counsel Plaintiff, and thus did not have the opportunity to observe her mental condition over a period of time.  Plaintiff was seen repeatedly in treatment by licensed clinical social workers for counsel from August 4, 2004, through January 20, 2005, R. 471-472 (Wilkes), and from October 4, 2005, through February 6, 2006, R. 475-476 (Rainey).   Upon consideration of all of the evidence of record, the entirety of Dr. Tay's report is not substantial evidence to find at step 2 that Plaintiff's depression was not a "severe impairment."

In summary, the ALJ's determination that Plaintiff's depression is not a severe impairment is not supported by substantial evidence in the record and was error.  An erroneous finding as to "severe" impairments at step 2 improperly forecloses a claimant's "ability to demonstrate the merits of her claim for disability with respect to her former work activities."  Flynn, 768 F.2d at 1275.  It cuts the impairment out of consideration at steps 3, 4, and 5.  Impairments must be evaluated in combination at all

stages of the analysis.  20 C.F.R. §§ 404.1523 and 416.923; Lucas v. Sullivan, 918 F.2d
1567, 1574 (11th Cir. 1990); Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990);
Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).  Impairments must be evaluated in
combination even though some impairments are not severe.  Hudson v. Heckler, 755
F.2d 781, 785 and n. 2 (11th Cir. 1985).  The Eleventh Circuit has "repeatedly held that
an ALJ must make specific and well-articulated findings as to the effect of the
combination of impairments when determining whether an individual is disabled."  Davis
v. Shalala, 985 F.2d at 534.

If this were the only error in this case, a remand would be warranted to require
that Plaintiff's depression be deemed to be a "severe" impairment at step 2, and the
remaining steps would have to be reconsidered with this finding.  The second error,
however, moots the issue of remand.

**Whether the ALJ erred in rejection of opinions of Drs. Meyer and Mauro**

Plaintiff contends that the ALJ was required to give controlling or significant
weight to the opinion of the treating physician, Dr. Meyer, and significant weight to the
consulting examination by Dr. Mauro.  The opinion of a claimant's treating physician
must be accorded considerable weight by the Commissioner unless good cause is
shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).
Generally, a treating physician's medical opinion is entitled to greater weight than the
opinion of a consulting physician.  Wilson v. Heckler, 734 F.2d 513, 516 (11th Cir.
1984).  This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed,
> longitudinal picture of your medical impairment(s) and may bring a unique
> perspective to the medical evidence that cannot be obtained from the

objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  Important to the determination of whether there is a "detailed, longitudinal picture" of impairments is the length of the treatment relationship, the frequency of examination, the extent of the knowledge of the treating source as shown by the extent of examinations and testing, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and whether the treating source is a specialist with respect to the particular medical issues.  20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and clearly articulated.  Phillips v. Barnhart, 357 F.3d at 1241.

> The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error. . . .  Where the Secretary has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true.

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.").  *See also*, Crawford v.

Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

The most important opinion here is that of Plaintiff's treating physician for several years, Dr. Meyer.  On March 2, 2006, Dr. Meyer said that he thought that Plaintiff could only sit for an hour at a time, and stand or walk for only an hour at a time.  R. 562.  This opinion is exactly the same as the one he rendered on January 6, 2004, although it is less comprehensive.  R. 416, 414.  It is also exactly the same as the comprehensive opinion of Dr. Mauro dated December 30, 2003.  R. 197, 199.  If Dr. Meyer's opinions had been given substantial weight, Plaintiff would have been found to be unable to do sedentary work and disabled for social security purposes.

The ALJ mentioned Dr. Meyer's 2006 opinion in passing, R. 21, but did not thereafter specifically address it directly except to say that Dr. McMillan's findings were "in conflict with the proposed limitations of Dr. Meyer."  R. 22.  Dr. McMillan, said the ALJ, found Plaintiff to be alert, in no distress, with functional range of motion in her joints, and no focal tenderness in her spine.  R. 21-22.  He noted that "except for the tender points related to fibromyalgia, the examination was benign."  R. 22.  Her cervical spine was within normal limits, and her neurological examination was normal as well.  Id.  The ALJ noted that Dr. McMillan found only mild to moderate osteoarthritis, and "the increase of her complaints were related directly to her stopping medication as [sic] the time."  Id.

The osteoarthritis found by Dr. McMillan was only in Plaintiff's hands and wrists, and that condition had little to do with the disabling effects of fibromyalgia and lupus. The ALJ seems to have reasoned that Dr. McMillan's finding of a lack of objective

evidence of arthritic impairments was substantial evidence in the record to fail to give

substantial weight to Dr. Meyer's opinion, which addressed impairments from the

combination of fibromyalgia, lupus, depression, and the debilitating effects of

medications needed to cope with these impairments.  That is a misunderstanding of the

nature of fibromyalgia.  The ALJ overlooked the fact that Dr. McMillan, a rheumatologist,

found tenderness in 14 of the 18 locations tested and agreed with the prior diagnosis of

fibromyalgia.  R. 232.

"Fibromyalgia is a rheumatic disease and the relevant specialist is a

rheumatologist."  Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).[20]

> The Ninth Circuit has described fibromyalgia as a "rheumatic disease that
> causes inflammation of the fibrous connective tissue components of
> muscles, tendons, ligaments, and other tissue.  Common symptoms . . .
> include chronic pain throughout the body, multiple tender points, fatigue,
> stiffness, and a pattern of sleep disturbance that can exacerbate the cycle
> of pain and fatigue associated with this disease."  *Benecke v. Barnhart*,
> 379 F.3d 587, 589-90 (9th Cir. 2004).

Davis v. Astrue, 287 Fed.Appx. 748, 762 (11th Cir. Jul 09, 2008) (not selected for

publication in the Federal Reporter, No. 07-11648).

The signs of fibromyalgia, according to American College of Rheumatology

guidelines, are primarily tender points on the body.  Green-Younger v. Barnhart, 335

F.3d 99, 107 (2nd Cir. 2003).  The court there said:  "Green-Younger exhibited the

clinical signs and symptoms to support a fibromyalgia diagnosis under the American

College of Rheumatology (ACR) guidelines, including primarily widespread pain in all

---

[20] The court there found that the administrative law judge had an "all pervasive
misunderstanding of the disease," finding inappropriate that the ALJ criticized the
claimant "for having consulted a rheumatologist rather than an orthopedist, neurologist,
or psychiatrist."  78 F.3d at 307.

four quadrants of the body and at least 11 of the 18 specified tender points on the

body."  *Id.*  A patient's subjective complaint "is an essential diagnostic tool" for the

treating physician.  *Id.*, *quoting* Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997).

Moreover, it is relevant to the weight of a treating physician's opinion that he or she

have "personally monitored the effectiveness of various therapies and found that they

failed to provide any significant improvement . . . ."  *Id.*  *See* Cox v. Barnhart, 345 F.3d

606, 609 (8th Cir. 2003) (a fibromyalgia case, finding a treating physician's opinion not

conclusory when it was the "culmination of numerous visits [plaintiff] had with her past

doctors, and his experience with treating her chronic pain.").

It is a misunderstanding of the nature of fibromyalgia to require " 'objective'

evidence for a disease that eludes such measurement."  Green-Younger, 335 F.3d at

108; Lee v. BellSouth Telecommunications, Inc., 2009 WL 596006, *8 (11th Cir. Mar 10,

2009) (not selected for publication in the Federal Reporter, No. 07-14901).  "Moreover,

a growing number of courts, including our own . . . have recognized that fibromyalgia is

a disabling impairment and that 'there are no objective tests which can conclusively

confirm the disease.' "  Green-Younger, 335 F.3d at 108 (citations to cases from the 6th,

8th, and 9th Circuits omitted).  "[P]hysical examinations will usually yield normal results

– a full range of motion, no joint swelling, as well as normal muscle strength and

neurological reactions."  *Id.*, at 108-109. "[S]welling of the joints is not a symptom of

fibromyalgia . . . ." <u>Sarchet</u>, 78 F.3d at 307.[21]  *See also* <u>Brown v. Barnhart</u>, No. 05-5143, 2006 WL 1431446, *2 and n. 1 (10th Cir. 2006) (unpublished).

In summary, the findings by Dr. McMillan are not in conflict with the opinion of Dr. Meyer.  Indeed, Dr. McMillan confirmed the diagnosis of fibromyalgia, having found 14 of the 18 pain trigger points.  R. 232.  The findings of Dr. McMillan, therefore, are not substantial evidence to fail to give substantial weight to the opinion of the treating physician, Dr. Meyer.

Defendant argues in the memorandum that Dr. Meyer's opinion was inconsistent with his treatment notes.  Doc. 22, p. 14.  This is the implicit reasoning of the ALJ.  R. 21-22.  He pointed out that the medical record generally indicated that Plaintiff's condition was stable, she was "described as doing well on her medical regimen," there was no documentation of dizzy spells, headaches, or other problems, and there were no documented limitations of her ability to sit, stand, or walk.  R. 21.  It was also noted that her symptoms waxed and waned, but increased when she stopped her medication.  R.

---

[21] The Eleventh adopted this reasoning in an unpublished decision, <u>Stewart v. Apfel</u>, No. 99-6132, 245 F.3d 793, 2000 U.S.App. LEXIS 33214 (11th Cir. Dec. 20, 2000).  In <u>Moore v. Barnhart</u>, 405 F.3d 1208 (11th Cir. 2005), while acknowledging that <u>Stewart</u> is not binding precedent, the court said:

> In *Stewart*, we reviewed medical research on fibromyalgia, which often lacks medical or laboratory signs, and is generally diagnosed mostly on a individual's described symptoms.  Because the impairment's hallmark is thus a lack of objective evidence, we reversed an ALJ's determination that a fibromyalgia claimant's testimony was incredible based on the lack of objective evidence documenting the impairment. *Id*. 245 F.3d 793, 2000 U.S.App. LEXIS 33214, at *9, n. 4.

405 F.3d at 1211 and n. 3.

22.  The ALJ observed that in August, 2004, Plaintiff was doing well enough for Dr.

Meyer to agree that she might stop her medication.  R. 21.

All of this notations are contained in the record, but this was an incomplete report

and fails all of the evidence.  The medical record contains the following notes and

observations:

> On December 31, 2003, Dr. Meyer saw Plaintiff for treatment.  R. 250.
> Plaintiff had been trying to get by without any pain medication, but was
> having "a lot more pain than usual."  *Id.*
>
> On April 12, 2004, Dr. Tay found that Plaintiff was limited "simple tasks"
> due to her physical problems.  R. 210.  Thus, even Dr. Tay recognized
> that Plaintiff's impairments limited her residual functional capacity.
>
> On May 27, 2004, Dr. McMillan noted that Plaintiff had tried to stop her
> medications, primarily due to expense (not because she was feeling
> better), and after stopping medications, had more difficulty and was again
> taking her medications.  R. 230.
>
> On June 7, 2004, Plaintiff was again seen by Dr. Meyer.  R. 241.  She said
> that she was fatigued overall and the "aching is just really coming back
> strong."  *Id.*
>
> On August 6, 2004, Plaintiff had felt over-medicated and had stopped
> most of her medications.  R. 468.  She said she was feeling better since
> she had stopped her medications, but her arthritis was really flaring up
> and she wanted referral to pain management.  *Id.*
>
> On August 24, 2004, Plaintiff reported to Dr. McMillan that she had
> returned to using her medications "after having more difficulty."  R. 240.
>
> On March 29, 2005, Dr. Meyer said "She has tried bicycle riding, tried
> some exercises, but anything she does seems to hurt.  She said she really
> cannot do the things she used to enjoy and what used to bring her
> pleasure now brings pain instead."  R. 464.  Plaintiff said that she had
> been having "a lot more pain lately."  *Id.*
>
> On July 19, 2005, Plaintiff told Dr. Meyer prescribed the highest dose of
> Percocet available to him because that medication was "not covering her
> pain as well as it did previously."  R. 462.

On September 21, 2005, the second note mentioned by the ALJ, after starting the highest dose of Percocet, Dr. Meyer noted: "She is otherwise doing well.  Said her pain is well managed under the current regimen and the anxiety is much better overall."  R. 458.

Thus, the record reflects that Plaintiff more consistently was in a lot of pain when she was treated by Dr. Meyer, and the only improvement came in September, 2006, after he increased her dose of Percocet to the highest level available to him.  The medical record stops at this point, and Plaintiff's condition in the succeeding months is unknown. It is true that Dr. Meyer did not test Plaintiff for her ability to move, bend, flex, or to sit or stand for long periods of time during a workday, but Dr. Meyers was treating fibromyalgia, and fibromyalgia is not evidenced by postural and movement testing.  The ALJ's finding that Dr. Meyer's opinion was inconsistent with his medical notes is not supported by substantial evidence in the record.

Finally, there is the ALJ's rejection of the opinion of Dr. Mauro.  The ALJ found that Plaintiff presented herself in a vastly different way to Dr. Mauro than she did to her "treating doctors," R. 22, but that is not true, as summarized above.  Plaintiff almost always presented in considerable pain when she was treated by Dr. Meyer.  The ALJ discounted Dr. Mauro's opinion because he "was privy only to [her self] reported history," but with fibromyalgia, that is always the case.  He criticized Dr. Maruo for having "no longitudinal history," the kind of history that a treating physician has built up over a period of time.  A consultative physician never has a longitudinal history.  Dr. Mauro's consultative examination not any different than the hundreds of such examinations I have read over the years which the Commissioner has fully credited and relied upon.  Moreover, the ALJ rejected the opinion of Dr. Meyer, who had a full and

complete "longitudinal history."  The ALJ found that Dr. Mauro "did a very poor physical examination."  R. 23.  If the ALJ meant that Dr. Mauro did not perform the kind of postural and movement examination that is performed for a patient with degenerative disc disease, then he again misunderstood the diagnostic methods for fibromyalgia. Despite the fact that the opinion of a consulting physician need not be given much weight by the ALJ, it is still evidence.  The reasons for rejecting Dr. Mauro's opinion here are not supported by substantial evidence in the record, and as a consequence Dr. Mauro's opinion is substantial evidence in the record that fully corroborates the 2004 and 2006 opinions of Dr. Meyer.

In summary, the reasons given for failing to give substantial weight to the opinions of the treating physician, Dr. Meyer, are not supported by substantial evidence. The ALJ erred in failing to give his opinions substantial weight.

**The appropriate remedy**

Defendant suggests that the appropriate remedy to correct any deficiencies in the ALJ's opinion is to remand for further consideration.  Doc. 22, p. 17.  That is true for the first error, but not the second.  "Where the Secretary has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true."  <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1053 (11th Cir. 1986).  Dr. Meyer stated twice that due to the pain and other symptoms of her fibromyalgia, lupus, and depression, coupled with the debilitating effects of all of the medications she must take to cope with these medical and mental problems, Plaintiff is unable to do even sedentary work.  Since this opinion must be accepted as true, Plaintiff is unable to do any work in the national economy and is disabled.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge did not correctly follow the law and are not based upon substantial evidence in the record.  The decision of the Commissioner should be reversed and benefits be awarded.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits **REVERSED** and the Commissioner **ORDERED** to grant Plaintiff's applications for benefits.

**IN CHAMBERS** at Tallahassee, Florida, on April 22, 2009.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**